**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| **ABRAHAM M. P.,[1]** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **vs.** ) | **Case No. 21-cv-1713-DWD** |
| ) | |
| **COMMISSIONER OF SOCIAL** ) | |
| **SECURITY,** ) | |
| ) | |
| **Defendant.** ) | |

## MEMORANDUM AND ORDER

**DUGAN, District Judge:**

In accordance with 42 U.S.C. § 405(g), Plaintiff seeks judicial review of the final agency decision denying his application for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) pursuant to 42 U.S.C. § 423 and 42 U.S.C. § 1383(c). For the reasons discussed below, the final agency decision is due to be affirmed.

## Procedural History

Plaintiff applied for DIB and SSI on August 22, 2019, alleging a disability onset date of April 17, 2019 (Tr. 49).  After holding an evidentiary hearing, an Administrative Law Judge ("ALJ") denied his application on May 27, 2021 (Tr. 61). The Appeals Council denied Plaintiff's request for review on October 20, 2021, making the ALJ's decision the final agency decision subject to judicial review. *See* 20 C.F.R. § 404.981.  Plaintiff exhausted administrative remedies and filed a timely complaint for judicial review.

---

[1] In keeping with the Court's practice, Plaintiff's full name will not be used in this Memorandum and Order due to privacy concerns. *See* Fed. R. Civ. P. 5.2(c) and the Advisory Committee Notes thereto.

**Applicable Legal Standards**

To qualify for DIB and SSI, a claimant must be disabled within the meaning of the applicable statutes.[2] Under the Social Security Act, a person is disabled if he has an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(a).

To determine whether a claimant is disabled, the ALJ considers the following five questions in order: (1) Is the claimant presently unemployed? (2) Does the claimant have a severe impairment? (3) Does the impairment meet or medically equal one of a list of specific impairments enumerated in the regulations? (4) Is the claimant unable to perform her former occupation? and (5) Is the claimant unable to perform any other work? *See* 20 C.F.R. § 404.1520. An affirmative answer at either step 3 or step 5 leads to a finding that the claimant is disabled. A negative answer at any step, other than at step 3, precludes a finding of disability. The claimant bears the burden of proof at steps 1–4. Once the claimant shows an inability to perform past work, the burden then shifts to the Commissioner to show the claimant's ability to engage in other work existing in significant numbers in the national economy. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001).

---

[2] The statutes and regulations pertaining to Disability Insurance Benefits (DIB) are found at 42 U.S.C. § 423, et seq., and 20 C.F.R. pt. 404. The statutes and regulations pertaining to SSI are found at 42 U.S.C. § 1382 and 1382c, et seq., and 20 C.F.R. pt. 416. As is relevant to this case, the DIB and SSI statutes are identical. *See Craft v. Astrue*, 539 F.3d 668, 647, n.6 (7th Cir. 2008). For convenience, most citations herein are to the DIB regulations.

Here, the scope of judicial review is limited. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ." 42 U.S.C. § 405(g). Accordingly, the Court is not tasked with determining whether or not Plaintiff was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). The Supreme Court defines substantial evidence as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 203 L. Ed. 2d 504 (Apr. 1, 2019) (internal citations omitted). In reviewing for "substantial evidence," the Court takes the entire administrative record into consideration but does *not* "reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ." *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019). However, while judicial review is deferential, it is not abject; the Court does not act as a rubber stamp for the Commissioner. *See Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010).

## The Decision of the ALJ

The ALJ followed the five-step analytical framework described above. At step one, he determined that Plaintiff had not engaged in substantial gainful activity since the alleged disability onset date and meet the insured status requirements of SSA through December 31, 2020 (Tr. 51). At step two, the ALJ found that Plaintiff has the following severe impairments: multiple injuries sustained in a car accident, headaches, and insomnia (Tr. 52). The ALJ also found that Plaintiff has mental impairments of dysthymia, bipolar disorder, and generalized anxiety disorder (Tr. 52). The ALJ

determined that Plaintiff had mild limitations in all four functional areas of mental disorders in the Listings of Impairments, 20 CFR, Part 404, Subpart P, Appendix 1 ("Paragraph B criteria") (Tr. 52-53), and were thus non-severe (Tr. 53).

At step three, the ALJ found that Plaintiff does not have any impairments or combination of impairments that meet any of the listings set forth in the Listing of Impairments (Tr. 53).  The ALJ specifically referenced Listing 1.15 (Disorders of the skeletal spine resulting in a compromise of a nerve root), Listing 1.16 (Lumbar spinal stenosis resulting in a compromise of the cauda equine), Listing 1.17 (Reconstructive surgery or surgical arthrodesis of a major weight-bearing joint), Listing 1.18 (Abnormality of a major joint in any extremity), along with guidance on headaches and Listing 11.02 for epilepsy (Tr. 53-55).

Before proceeding to step four, the ALJ found that Plaintiff has the residual functional capacity ("RFC") to perform a range of light work (20 C.F.R. § 404.1567(b)), defined as:

> Sitting up to fifteen minutes at one time and four hours during an eight-hour workday; standing and walking up to fifteen minutes at one time and four hours during an eight-hour workday; lifting, carrying, pushing, and pulling ten pounds occasionally and five pounds frequently; occasionally climbing ramps and stairs, stooping, kneeling, crouching, and crawling; no climbing ladders, ropes, or scaffolds; frequent reaching bilaterally; and simple routine tasks with the ability to sustain the attention, concentration, persistence, and pace needed to complete these tasks.

(Tr. 55).

At step four, the ALJ relied on the testimony of a vocational expert ("VE") to find that Plaintiff was unable to perform his past relevant work as a construction laborer and

car detailer (Tr. 60).  However, the ALJ concluded that based on Plaintiff's RFC, age, education, and work experience, that Plaintiff could make a successful adjustment to other work that exists in significant numbers in the national economy, including unskilled (SVP-2) sedentary occupations of sorter, laminator, and order clerk (Tr. 61). Accordingly, at step five, the ALJ found that Plaintiff was not disabled from the alleged disability onset date through the date of his decision on May 27, 2021 (Tr. 61).

## The Evidentiary Record

Plaintiff seeks disability based on the injuries he sustained after a car accident on or about April 17, 2019.  These injuries include back pain, left leg pain, memory loss, sleeping issues, knee issues, pelvic issues, and constipation issues (Tr. 229).  Plaintiff was 17 years old at the time of his accident (Tr. 205, 212).  Plaintiff has completed high school, and prior to his accident, Plaintiff worked as a custodian, and in construction and car sales (Tr. 70, 230).

### *Relevant Medical Records*

On April 18, 2019, Plaintiff presented to Hughston Trauma Department following a motor vehicle accident (Tr. 361-362).  Plaintiff sustained a fracture to his left knee, pelvis, and back (Tr. 362, 354).  Plaintiff immediately underwent back and knee surgery (Tr. 361-362).  John A. Mansour, D.O. performed Plaintiff's knee surgery (Tr. 361).  Dr. Mansour cleaned and removed debris from the knee laceration and confirmed no penetration of the knee joint (Tr. 362).  Dr. Mansour closed the surgical site and indicated that Plaintiff's right pelvic fracture was nonoperative (Tr. 362).  Timothy Hopkins, M.D. conducted Plaintiff's spine surgery (Tr. 362), performing an open reduction internal fixation of L1

burst fracture (Tr. 380). Following his surgeries, Plaintiff continued to be treated by Dr. Mansour and Dr. Hopkins.  He was also treated by his primary care physician, David Davis, M.D. (Tr. 334-347, 382-390, 404-498).

### A.  Dr. Mansour

Plaintiff presented to Dr. Mansour for follow-up appointments on June 4, 2019 (Tr. 356), July 16, 2019 (Tr. 354), and October 22, 2019 (Tr. 359).  On June 4, 2019, Plaintiff reported no pain in his pelvis, with mild pain along the incision of his left knee (Tr. 357). Dr. Mansour indicated that Plaintiff's vital signs were stable, and his knee incision was healing well without signs of infection (Tr. 357).  Plaintiff had full range of motion in his knee, active range of motion in his hip, and normal swelling (Tr. 357).  Plaintiff was "weight bearing as tolerated" with a cane and with no antalgic gait and advancing well with physical therapy (Tr. 357).  Plaintiff's follow-up imaging showed progressive healing in near anatomical alignment.  By July 16, 2019, Plaintiff was weight bearing without his cane or antalgic gait, and he had full range of motion in his knee, normal swelling, no calf tenderness, active range of motion in his hip, and his balance had returned (Tr. 355).

On October 22, 2019, Plaintiff returned for a final visit with Dr. Mansour.  He again reported no pain in his pelvis, but mild pain along his thigh.  Plaintiff reported having a recent CT which showed "ball of scar tissue in his thigh."  Plaintiff also reported seeing a chiropractor for stretching and massage, which he reported gave some relief.  Plaintiff reported muscle aches, nervousness, irritability, depression, sleep disturbances, and paranoia (Tr. 360).  Dr. Mansour examined Plaintiff and found full range of motion in

6

Plaintiff's knee, normal swelling, no calf tenderness, active range of motion in his hip, muscle strength testing 5/5, and ability to weight bear without an assistive device or antalgic gait.  Plaintiff's imaging continued to demonstrate progressive healing of the fractures, and the fracture lines were no longer visible (Tr. 360).  Dr. Mansour discussed that he would normally release Plaintiff for a final physical therapy visit to help build his endurance to return to work, but instead instructed Plaintiff to follow his neurosurgeon's recommendations due to the continued weight and bending restrictions for his back (Tr. 360).  Dr. Mansour discussed waiting until after Plaintiff's rods were removed from his L1 bust fracture and his neurosurgeon's restrictions were lifted before considering going back to work (Tr. 360).

###### B.    Dr. Hopkins

Plaintiff presented to Dr. Hopkins for follow-up appointments on July 16, 2019, September 17, 2019, September 26, 2019, October 22, 2019, November 14, 2019, December 17, 2019, and June 2, 2020.  On July 16, 2019, Plaintiff reported that he was doing "very well" and not taking pain medication (Tr. 380).  Plaintiff denied back pain and paresthesia (Tr. 380).  On examination, Dr. Hopkins indicated that Plaintiff has good bilateral strength and sensation, erect posture, normal sagittal alignment, and that his incisions were well healed (Tr. 380).  Imaging revealed stability of the alignment and interval increase in density of the fractured L1 vertebra indicating healing (Tr. 380).  Dr. Hopkins assessed that Plaintiff's fracture was healing and recommended that Plaintiff discontinue use of his back brace to begin increasing his level of activity (Tr. 380).

On September 17, 2019, Plaintiff reported pain in his left buttock and posterior hip,

occasionally extending down the back of his thigh (Tr. 378).  Plaintiff reported that the pain is worse with activity such as standing, walking and prolonged immobilization, but he gets some relieve by lying down (Tr. 378).  Dr. Hopkins observed that Plaintiff's wounds were well-healed, and his surgery site was nontender, but that he had tenderness over the SI joint on the left superiority (Tr. 378).  Plaintiff's reflexes were 2+ symmetric and his straight leg raise test elicits some pain in the left buttock at the same point (Tr. 378).  Dr. Hopkins recommended proceeding with an MRI of the lumbar spine to determine whether Plaintiff has any nerve root compression (Tr. 378). Plaintiff's imaging demonstrated stable appearance of his fused L1 segment, and Dr. Hopkins found no evidence of any disc herniation, canal stenosis, foraminal stenosis or other compressive pathology to explain Plaintiff's hip symptoms (Tr. 376).  Dr. Hopkins also observed good bilateral strength and sensation, and normal gait and posture (Tr. 376).

On October 22, 2019, Plaintiff reported that his left hip was better after chiropractic care and denied any new symptoms (Tr. 374).  Dr. Hopkins observed mostly normal findings on exam but indicated that Plaintiff was very thin, and the instrumentation was palpable under his skin (Tr. 374).  Dr. Hopkins reported that Plaintiff's incisions were well healed, and he had normal gait, motor strength in his upper and lower extremities (Tr. 374).  After assessing positive findings from Plaintiff's CT imaging, Dr. Hopkins recommended removing Plaintiff's instrumentation to alleviate pain and reestablish motion segments (Tr. 374-375).  Plaintiff underwent the surgery to remove his instrumentation, and by November 14, 2019, Dr. Hopkins indicated that his incisions were well healed, and his back has a normal configuration with no kyphosis and normal

lumbar lordosis (Tr. 370).  Plaintiff reported that his pain was gradually improving, and he was doing quite well, but he still reported pain in his left thigh.  Dr. Hopkins recommended that Plaintiff continue wearing his back brace to assist in preventing kyphosis (Tr. 370, 374).

On December 17, 2019, Plaintiff denied any new symptoms and reported that his back felt good without pain (Tr. 367).  Plaintiff denied any paresthesia or weakness (Tr. 367).  On examination, Dr. Hopkins observed that Plaintiff's back was nontender, and had multiple well-healed abrasions (Tr. 367). Dr. Hopkins observed some prominence of the spinous process of T12, and Plaintiff's imagining demonstrated evidence of additional settling of the T12-L1 level, with a slight degree of increase in kyphosis (Tr. 367).  Dr. Hopkins indicated that the T12-L1 segment was essentially stable and recommended no further treatment (Tr. 367).  Dr. Hopkins discontinued Plaintiff's back brace and advised Plaintiff to gradually increase his level of activity (Tr. 367).  Dr. Hopkins stated that Plaintiff could return to driving and normal function and advised Plaintiff to return in 3 months for another x-ray, or if he developed any recurrence of back pain s (Tr. 367).

On June 2, 2020, Plaintiff reported that he was doing well, but had some pain in the mornings (Tr. 365).  Plaintiff denied any weakness in his lower extremities but complained of pain in his right buttock and posterior thigh (Tr. 365).  Plaintiff's prior imaging demonstrated no evidence of nerve root compression, and his follow-up x-rays demonstrated no change in the slight kyphosis at the level of the fracture.  Dr. Hopkins stated that the T11 had settled nicely onto the T12 and the complex appeared "very stable" (Tr. 365).  Dr. Hopkins's exam revealed palpable mid deformity at his fracture site

and stated that Plaintiff was very thin with his T12 spinous process prominent, but that it was nontender (Tr. 365). Dr. Hopkins observed good bilateral strength and normal gait and posture, and his assessment revealed moderate chronic pain (Tr. 365). Dr. Hopkins recommended that Plaintiff continued to advance his level of activity and opined that over time his tolerance for activity would increase and he "should be able to work in any capacity" (Tr. 365). Dr. Hopkins removed all of Plaintiff's restrictions and suggested waiting six months to determine if he would improve (Tr. 365). He also recommended against narcotic pain medication (Tr. 365).

At some point in time, Dr. Hopkins submitted a Treating Source Statement which is undated (Tr. 363). In this statement, Dr. Hopkins reported that Plaintiff should not lift over 25 pounds, and should only bend, twist, and squat in small amounts (Tr. 363). He also stated that Plaintiff should site and stand as tolerated (Tr. 363).

### C.      Dr. Davis

From May 2019 to March 2021, Plaintiff was treated by his primary care physician, Dr. Davis (Tr. 334-347, 382-390, 404-498). On May 14, 2019, Plaintiff presented to Dr. Davis for a follow up appointment following his accident (Tr. 340). Plaintiff reported that he was walking with a walker, had begun physical therapy, and stated that his pain was "fairly well controlled" (Tr. 340). Dr. Davis examined Plaintiff and indicated that Plaintiff's surgical wounds were healing and reported no abnormal findings (Tr. 340).

On June 21, 2019, Plaintiff reported insomnia and constipation (Tr. 338-339). Dr. Davis examined Plaintiff and his notes indicate that Plaintiff continued to wear a back brace and has seen good improvement with his mobility and strength with physical

therapy although he has limited flexion extension in his thoracic and lumbar spine (Tr. 338-339).  Dr. Davis's findings were normal, and he prescribed medication for Plaintiff's insomnia and constipation (Tr. 339).  On August 3, 2019, Plaintiff reported that he was doing better with his sleep and no longer having recurrent thoughts of the accident (Tr. 337).  Plaintiff was also released from physical therapy (Tr. 337).  On August 23, 2019, Plaintiff reported a lot of pain in his left buttock from the accident, in addition to increased worrying and anxiety (Tr. 336).  Plaintiff described his anxiety as "relatively mild" and Dr. Davis indicated that he would continue to monitor symptoms (Tr. 337).

On November 19, 2019, Plaintiff reported pain following his rod removal surgery (Tr. 389).  Dr. Davis reported relatively normal exam findings but noted that Plaintiff was wearing a rigid back brace (Tr. 389).  Dr. Davis prescribed a brief narcotic pain medication for his back pain and recommended a follow-up if his pain persists (Tr. 390).  On January 13, 2020, Plaintiff reported significant anxiety and difficulty sleeping, and intermittent pain from his accident (Tr. 387).  Dr. Davis reported normal exam findings and diagnosed Plaintiff with a generalized anxiety disorder (Tr. 388).  Dr. Davis started Plaintiff on medication for anxiety and recommended ibuprofen as needed for his back pain (Tr. 388).

On February 3, 2020, Plaintiff reported that his anxiety problems were "markedly improved", and he was sleeping better, however, he continued to have chronic mid back pain (Tr. 386).  Dr. Davis reported mostly normal findings on Plaintiff's physical examination but indicated mid back tenderness (Tr. 386).  Dr. Davis continued Plaintiff's anxiety medications and recommended that Plaintiff follow-up with his surgeon about his back pain (Tr. 387).

Dr. Davis examined Plaintiff again on May 28, 2020, June 26, 2020, July 24, 2020, September 4, 2020, November 24, 2020, March 3, 2021, and March 10, 2021. At these appointments, Plaintiff reported continued chronic back pain problems and continued dysthymia and anxiety (Tr. 383-385). Dr. Davis observed mostly normal findings on his exam but indicated diffuse tenderness in Plaintiff's back on May 28, 2020, June 26, 2020, and September 4, 2020 (Tr. 383, 385, 409, 424, 436). He also observed limited range of motion in Plaintiff's back on most exams after June 26, 2020 (Tr. 383, 385, 409, 424, 464, 488). Dr. Davis continued or increased Plaintiff's pain medications and dysthymia and anxiety medications (Tr. 383-384, 409, 423, 436, 464, 489). On November 24, 2020, Dr. Davis suggested a trial of medications for Plaintiff's insomnia and instructed him to follow-up with his back specialist for his chronic pain (Tr. 437).

On March 24, 2021, Dr. Davis completed a Treating Source Statement (Tr. 404-407). In this statement, Dr. Davis reported that Plaintiff had approximately 28 bad days out of 28 days because of his back pain (Tr. 405). Dr. Davis opined that Plaintiff has postural limitations and could not work due to his continued back pain (Tr. 406). He stated that Plaintiff would be off task most of the day, and that he did not believe Plaintiff would benefit from laying down or reclining during working hours (Tr. 405-406). Dr. Davis did not evaluate Plaintiff for potential restrictions on lifting or carrying items (Tr. 406). Dr. Davis reported that Plaintiff has tried working but was unable to tolerate a full work schedule (Tr. 406).

### *Function Reports*

In October 2019, Plaintiff and his stepmom, Connie Pruiett, completed Function

Reports for Plaintiff (Tr. 250, Tr. 239). Plaintiff reported that his injuries affected his ability to lift, squat, bend, stand, reach, walk, sit, kneel, complete tasks, concentrate, and remember (Tr. 255). Plaintiff's stepmom reported similarly, indicating that Plaintiff did not have full range of motion, could not stand or sit for long periods of time, or bend over or twist repeatedly (Tr. 239).

Plaintiff estimated that he could lift 25 pounds and walk one-half mile before needing a 10-minute rest (Tr. 255). He stated that he gets sore easily which prevents him from finishing some tasks (Tr. 255). He also forgets instructions and dates, but he can pay attention for 5-10 minutes, finish what he starts, and can follow written and spoken instructions (Tr. 255). Plaintiff's stepmom also reported that Plaintiff has issues with short term memory, making it hard to stay on task (Tr. 239-245). She also stated that Plaintiff suffers from stress and anxiety and has trouble sleeping due to pain and bad thoughts (Tr. 239-245). Plaintiff was not taking any medications for his injuries or conditions when he completed the report in October 2019 (Tr. 257). However, by January 6, 2021, Plaintiff reported that he was taking medication for depression, anxiety, sleep, and pain in his back, nerves, joints, and sciatic (Tr. 289, Tr. 309). Plaintiff stated that these medications caused him to be drowsy and dizzy (Tr. 289).

In March 2021, Plaintiff's mother, Rischa Proffitt, and Plaintiff's wife, Rachel Pruiett, completed Third-Party Function Reports (Tr. 304, 313). Plaintiff's wife reported that Plaintiff's sciatica pain prohibits Plaintiff from sitting or standing longer than 15-20 minutes at a time, and he cannot bend, twist, or lift anything over 20-25 pounds without extreme and prolonged pain (Tr. 313-314). She also stated that Plaintiff suffers from a

loss of smell and touch, and has diminished cognitive function, short- and long-term memory loss, understanding, thought processing, decision making, reasoning, ability to process emotions, processing emotions, and planning (Tr. 313).

Plaintiff's mother reported similarly and indicated that Plaintiff could not work more than 2 days in a row before being bedridden by the pain in his back, neck, head, nerves, and left side (Tr. 304). She also reported that Plaintiff vomits and has mental anguish from the pain, along with shakes and difficulty walking (Tr. 304). Ms. Proffitt estimated that Plaintiff can stand for approximately five-minutes but is unable to walk a block or go up and down stairs (Tr. 304). He can also complete short trips to the store for an item or two and prepare simple meals. However, he has difficulties performing housework such as sweeping, laundry, washing windows, climbing ladders, or doing anything that requires repetitive motions longer than five minutes on his feet. He also has difficulties bending and dressing himself (Tr. 304). Plaintiff can sit in a car for approximately 90 minutes before needing to stop and lay down because of the pain (Tr. 305). Plaintiff also struggles with short term memory, PTSD, depression, stress, and can be come agitated and worried (Tr. 305).

### State Agency Reports

On September 5, 2020, Plaintiff presented to Anna Stapleton, PSYD for a psychology consult (Tr. 391-395). Plaintiff reported his history with depression and anxiety (Tr. 393). He reported that he had difficulty sleeping, erratic appetite, increased irritability and agitation, tensions due to chronic pain, and feelings of discouragement, worry, guilty, worthlessness, hopelessness, poor energy and motivation, social

14

withdrawal, and isolation from others (Tr. 393).  Plaintiff denied recent suicidal thoughts (Tr. 393).  He reported anger issues and nightmares (Tr. 393).

Dr. Stapleton observed that Plaintiff's appearance was clean and well-kempt, and he was dressed appropriately.  Plaintiff had no observable difficulties with speech, and he presented no signs of physical or emotional distress (Tr. 392).  Plaintiff's thought process was logical and coherent, and thought content was appropriate, but his mood was saddened, and affect was congruent (Tr. 392).  Dr. Stapleton described Plaintiff as pleasant, cooperative, and willing to participate in the evaluation and respond to questions and inquiries (Tr. 392).  Plaintiff denied thoughts of harm (Tr. 392).  Plaintiff was also alert and oriented and had appropriate ability to sustain adequate concentration and focus throughout the evaluation, which lasted 30 minutes (Tr. 391-392). Plaintiff's short-term and long-term memory was intact, and correctly identified Dr. Stapleton's mental status inquiries (Tr. 392). Dr. Stapleton opined that Plaintiff was equipped to handle his own funds (Tr. 393).  Dr. Stapleton also diagnosed Plaintiff with an unspecified bipolar and related disorder (Tr. 394).

On September 26, 2020, Plaintiff presented to Peter Sorokin, M.D. (Tr. 397-403). Plaintiff reported continued back pain and his left leg due to sciatica, especially when he bends, twists, or lifts (Tr. 397).  He takes pain medications at night and lies down to relieve pain (Tr. 397-398).  Plaintiff reported that he can walk one-half a mile, stand for one hour, sit for two and one-half hours, and lift, pull and push up to thirty pounds (Tr. 398). Plaintiff cannot cook because coordination in his hands is sometimes off, but he can feed himself, clean using a broom only, bathe and dress himself, use buttons or zippers, open

a door and jar, pick up a pen and coin, drive, and shop (Tr. 398).

Dr. Sorokin reported normal exam findings (Tr. 402). Dr. Sorokin observed that Plaintiff could get on and off the exam table with no difficulty, could walk greater than 50 feet without support, had non-antalgic gait without the use of assistive devices, was able to perform toe/heel walk, had 5/5 grip strength in both hands, normal ability to grasp and manipulate objects, could fully extend his hands, and make fists (Tr. 399). Plaintiff had full range of motion in his shoulders, elbows, wrists, hips, knees, ankles, and cervical spine, but a lower range of mobility in his lumbar spine (Tr. 399, 402). Plaintiff's straight leg raise test supine and seated were negative bilaterally (Tr. 399).

In November 2019, state agency medical consultant, Kathleen Treanor, M.D. completed a Disability Determination Explanation (Tr. 89-94), indicating that Plaintiff had no physical restrictions and did not meet the listing qualifications for 1.02 Dysfunction – Major Joints (Tr. 92-93). In October 2020, consultants Vidya Madala, M.D. and Joseph Mehr, PHD, examined Plaintiff's claim on reconsideration (Tr. 105-123). Dr. Madala evaluated impairments of dysfunction – major joints, spine disorders depressive, bipolar and related disorders, anxiety, and obsessive-compulsive (Tr. 113).

Dr. Merh assessed Plaintiff's psychiatric review and found that Plaintiff had no limitations in his ability to understand, remember, or apply information, but mild limitations in his ability to interact with others, concentrate, persist, or maintain pace, and adapt or manage oneself (Tr. 114). Dr. Madala concluded that Plaintiff had both exertional and postural limitations because of the decreased range of motion in his lateral spine (Tr. 117-118). Dr. Madala found that Plaintiff could occasionally lift or carry 50

pounds and frequently lift or carry 25 pounds, could stand, walk, or sit for a total of 6 hours in an 8-hour workday, and was unlimited in his ability to push or pull, including operating hand or foot controls (Tr. 117). Dr. Madala further found that Plaintiff could only frequently climb ladders, ropes, scaffolds, stoop, and crouch, but was otherwise unlimited in his ability to climb ramps/stairs, balance, kneel, and crawl (Tr. 117-118).

### *Evidentiary Hearing*

On April 14, 2021, Plaintiff testified at an evidentiary hearing (Tr. 66). Plaintiff was represented by an attorney at the hearing (Tr. 66). Plaintiff testified that he could sit and stand for 15-20 minutes on a good day before hurting and could not lift anything over 15-20 pounds (Tr. 73-74). He speculated that he might be able to grocery shop, but only if he was grabbing one or two items (Tr. 74). Plaintiff cannot do laundry or dishes because of the repetitive motion and strain on his back (Tr. 74). Plaintiff also testified that he gets headaches almost daily, and once or twice a week the headaches are so bad he throws up from the pain (Tr. 75-76). Plaintiff takes pain medications for his headaches, but reports that they do not help (Tr. 77). Plaintiff is not undergoing psychological treatment related to the accident, but he began taking medications for depression and anxiety in June 2019 (Tr. 76). Plaintiff reported that these medications help (Tr. 77).

Carrie Anderson, a Vocational Expert ("VE") also testified at the hearing (Tr. 66). She considered two hypothetical individuals. The first, with Plaintiff's age, education, and work experience, and the following limitations:

> sit six hours during an eight hour work day, stand and walk six hours during an eight hour work day, lift, carry, push and pull 20 pounds occasionally, 10 pounds frequently, can occasionally climb ramps and

stairs, stoop, kneel, crouch, and crawl, no climbing ladders, ropes, or scaffolds, frequent reaching bilaterally, and can perform simple, routine tasks and sustain the attention, concentration, persistence, and pace needed to complete those tasks.

(Tr. 83). The VE testified that this hypothetical person would not be able to perform Plaintiff's past work as a construction laborer or car detailer (Tr. 82-83). However, the hypothetical person could perform light, SVP positions such as ticket seller, parking lot attendant, and mail room clerk which exist in sufficient number in the national economy (Tr. 84).

Next, the VE considered the same hypothetical person but with further limitations requiring the individual to sit "up to 30 minutes at one time and four hours during an eight hour work day, [ ] stand and walk up to 30 minutes at one time and four hours during an eight hour work day, lift, carry, push, and pull 10 pounds occasionally and 5 pounds frequently" (Tr. 84). The VE testified that this hypothetical person would be able to perform sedentary, SVP 2, employment with positions such as sorter, laminator, and order clerk, which exist in sufficient number in the national economy (Tr. 84-85). The ALJ ultimately crafted Plaintiff's RFC with the limitations of the second hypothetical person, with the additional limitations of only sitting, standing, and walking up to 15 minutes at one time and four hours during an eight-hour workday (Tr. 55).

## Analysis

Judicial review of the ALJ's decision is limited to determining whether the ALJ's findings are supported by substantial evidence or based upon a legal error. *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002). "Substantial evidence is such relevant evidence

as a reasonable mind might accept as adequate to support a conclusion." *Burmester*, 920 F.3d at 510 (citing *Schaaf v. Astrue*, 602 F.3d 869, 874 (7th Cir. 2010). "Where substantial evidence supports the ALJ's disability determination, [the Court] must affirm the decision even if 'reasonable minds could differ concerning whether [the claimant] is disabled.'" *Id.* (citing *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008)). In reviewing an ALJ's decision, the Court "will not reweigh the evidence, resolve debatable evidentiary conflicts, determine credibility, or substitute [its] judgment for the ALJ's determination." *Reynolds v. Kijakazi*, 25 F.4th 470, 473 (7th Cir. 2022) (internal citation omitted). Nevertheless, where the ALJ's decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Steele*, 290 F.3d at 940.

Here, Plaintiff is proceeding *pro se*, so his pleadings are entitled to liberal construction. *See, e.g.*, *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). Mindful of this construction, the Court construes Plaintiff's submissions (Doc. 2; Doc. 29; Doc. 30) as raising two distinct legal arguments. First, Plaintiff argues that the medical opinions of Dr. PineMattas and Dr. Schneider support a finding of disability (Doc. 29). However, Plaintiff did not begin treating with Dr. PineMattas and Dr. Schneider until March 2021, and most of the records he submitted to the Court from these sources are dated after the ALJ's decision (Doc. 29). Thus, to the extent Plaintiff argues that this new evidence was not considered, the Court construes this argument as raising a question of legal error. *See Rita Mary K. v. Kijakazi*, No. 21 C 4598, 2022 WL 17583780, at *4 (N.D. Ill. Dec. 12, 2022) (citing *Stepp v. Colvin*, 795 F.3d 711, 723 (7th Cir. 2015) and *Perkins v. Chater*, 107 F.3d 1290,

1294 (7th Cir. 1997)) (the Court retains jurisdiction to review legal conclusions concerning time-relevant evidence). Second, Plaintiff also argues generally that the ALJ improperly discredited the opinions of Dr. Davis and Plaintiff's mother (Doc. 29; Doc. 30-1). These opinions were presented to the ALJ. Thus, this argument concerns the ALJ's factual analysis, and the Court must determine whether the ALJ's findings were supported by substantial evidence.

### A.    Newly Presented Evidence

Plaintiff represents that he began treating with Dr. PineMattas in March 2021, and Dr. PineMattas later referred Plaintiff to Adam Schneider, CRNA for pain management (Doc. 29). Plaintiff argues that after he began treating with Dr. PineMattas and Dr. Schneider, his MRI findings became concerning, requiring Dr. Schneider to perform nine minor surgeries (Doc. 29). These records also reveal that Plaintiff was hospitalized for suicidal ideations, PTSD, bipolar with depression, and anxiety in August 2021 (Tr. 23). Following the hospitalization, Plaintiff started on new medications (Tr. 24), and Dr. PineMattas ordered an additional MRI scan, therapy, and referred Plaintiff to pain management for injections for his chronic back pain (Tr. 24-25). Plaintiff argues that Dr. PineMattas's assessments and findings of marked limitations support a finding of disability, and specifically indicate that Plaintiff meets Listings 11.08, 11.18 12.04, 12.06, and 12.15 (Doc. 29).

With his briefing, Plaintiff submitted over fifty pages of additional medical records (Doc. 29, p. 6-61), including:

1.   Radiology reports from the date of Plaintiff's car accident, April 18, 2019

(Doc. 29, pp. 6-9);

2. Dr. Hopkins's surgical notes from Plaintiff's surgery to repair his L1 burst fracture on April 18, 2019 (Doc. 29, pp. 10-11);

3. Dr. Hopkins's treatment notes from October 22, 2019 (Doc. 29, pp. 12-13);

4. Dr. Hopkins's discharge summary following Plaintiff's surgery to remove his instrumentation on October 30, 2019 (Doc. 29, p. 14) and related x-ray results following the surgery and dated November 14, 2019 (Doc. 29, pp. 15-16);

5. Dr. Davis's Treating Source Statement, dated May 24, 2021 (Doc. 29, pp. 17-22);

6. Radiology reports and office notes dated March 26-27, 2021, related to Plaintiff's complaints of bilateral testicular pain (Doc. 29, pp. 23-25);

7. Clinic Office Records and treatment notes from Dr. PineMattas dated June 8, 2021 (Doc. 29, pp. 26-29), September 30, 2021 (Doc. 29, pp. 43-44), and June 22, 2022 (Doc. 29, pp. 45-47);

8. Radiology Reports from an x-ray of Plaintiff's spine, dated June 8, 2021 (Doc. 29, pp. 30-31);

9. Imaging reports from Plaintiff's spine, dated June 23, 2021 (Doc. 29, pp. 32-34);

10. Emergency medicine records and related treatment notes dated August 13, 2021 (Doc. 29, pp. 48-53);

11. Hospitalization records, related treatment notes, and communications dated August 25-26, 2021 (Doc. 29, pp. 35-38);

12. Imaging reports of Plaintiff's brain MRI dated September 7, 2021, and related office notes dated September 10, 2021 (Doc. 29, pp. 40-42); and

13. Treatment notes from Dr. Schneider dated April 13, 2022 (Doc. 29, pp. 55-59).

Some of these records, including the records from Dr. Hopkins and Dr. Davis's Treating Source Statement are included in the administrative record or referred to in the administrative record (Doc. 18)[3]. Plaintiff also submitted some of these records to the Appeals Council for consideration, including:

1. Lab reports from March 22, 2021 (Tr. 16-18);

2. Treatment notes from Dr. PineMattas dated April 3-5, 2021, related to

---

[3] The Court could not find Dr. Hopkins's surgical notes from Plaintiff's surgeries on April 18, 2019, or October 30, 2019, in the administrative record, or the imagining reports from those dates.  However, the information from those documents were referred to in the administrative record throughout Dr. Hopkins's treatment notes.

Plaintiff's complains of testicular pain and fertility testing (Tr. 19);

3. Radiology reports from an x-ray of Plaintiff's spine and related treatment records dated June 8, 2021 (Tr. 9-15, 20-22); and

4. Plaintiff's treatment records from August 25-30, 2021 concerning his hospitalization for mental health evaluation (Tr. 23-30).

(Tr. 8-30). The Appeals Council reviewed the records from March 22, 2021 (Tr. 16-18) and April 3-5, 2021 (Tr. 19) but did not exhibit the evidence because the evidence did "not show a reasonable probability that it would change the outcome of the decision." (Tr. 2). Further, the Appeals Council found that the records dated from June 8-August 30, 2021 (Tr. 9-15, 20-30) were not time-relevant, stating: The Administrative Law Judge decided your case through May 27, 2021. This additional evidence does not relate to the period at issue. Therefore, it does not affect the decision about whether you were disabled beginning on or before May 27, 2021." (Tr. 2).

The Appeals Council did not err in its decision to not exhibit the additional evidence submitted. 20 C.F.R. § 404.970(b) states that additional evidence submitted to the Appeals Council will be evaluated "only if it is 'new and material' and 'relates to the period on or before the date of the [ALJ] hearing decision." *Stepp*, 795 F.3d at 721 (citing 20 C.F.R. § 404.970(b)). If the newly submitted evidence satisfies these conditions, the Appeals Council incorporates the evidence into the administrative record and evaluates that evidence with the record. *Id.* However, if the additional evidence "does not relate to the period on or before the date of the [ALJ] hearing decision … the Appeals Council will send … a notice that explain[s] why it did not accept the additional evidence and advises [the claimant of their] right to file a new application." 20 C.F.R. § 404.970(c).

In reviewing the Appeals Council's decision concerning newly submitted

evidence, review is "dependent on the grounds which the Council declined to grant plenary review." *Stepp*, 795 F.3d at 721. If the Council determined that the newly submitted evidence was "non-qualifying under the regulation", i.e., not "new and material" or not "time-relevant", the Court retains jurisdiction to review the conclusion for legal error. *Stepp*, 795 F.3d at 721 (citing *Farrell v. Astrue*, 692 F.3d 767, 771 (7th Cir. 2012)); *see also Rita Mary K.*, 2022 WL 17583780, at *4 (whether newly submitted evidence is time-relevant "remains a non-discretionary determination" subject to the Court's review). However, if the Council "deemed the evidence new, material, and time-relevant but denied plenary review of the ALJ's decision based on its conclusion that record—as supplemented—does not demonstrate that the ALJ's decision was 'contrary to the weight of the evidence'—the Council's decision not to engage in plenary review is 'discretionary and unreviewable." *Stepp*, 795 F.3d at 721 (citing *Perkins*, 107 F.3d at 1294).

Here, the Council found that the records prior to the ALJ's decision did "not show a reasonable probability that it would change the outcome of the decision." (Tr. 2). As the Council reviewed this evidence, and weighed it with the rest of the record, this decision is not subject to the Court's review. *Stepp*, 795 F.3d at 721. However, the Council also declined to exhibit the remaining documents dated from June 8, 2021, to August 30, 2021, because they were time-barred (Tr. 2). This finding is subject to review, but the Council did not err in its finding because the records all relate to evidence dated after the ALJ's decision on May 27, 2021 (Tr. 61) (determining that Plaintiff was not disabled from April 17, 2019, through the date of his decision on May 27, 2021). *See Stepp*, 795 F.3d at 723 (newly submitted evidence is not time-relevant if it does not relate to the period on

or before the date of the ALJ hearing decision).

Moreover, the remaining records submitted directly to the Court, which were not contained in the administrative record or submitted to the ALJ and Appeals Council, are not subject to review. *See Atkins v. Saul*, 814 F. App'x 150, 155 (7th Cir. 2020) ("Records that were not available to the ALJ (or even the Appeal Board) cannot be used to challenge the ALJ's decision.") (citing 42 U.S.C. § 405(g); *Stepp*, 795 F.3d at 721). Even if they were, they too are time-barred and do not relate to Plaintiff's current claim for disability as all the records were made *after* the ALJ's decision.

### B.      Substantial Evidence

Turning next to the ALJ's decision, the Court finds that the decision was not erroneous and was supported by substantial evidence. In reviewing the ALJ's opinion, the ALJ ultimately determined that Plaintiff was capable of a reduced range of light work, and crafted Plaintiff's RCF after consideration of medical opinions, prior administrative medical findings in the record, objective test results, treatment records reflecting the functional limitations associated with Plaintiff's impairments, and non-medical function reports (Tr. 55-59). The ALJ fairly summarized the relevant medical evidence. He further supported his determination with reference to the evidence and considered the evidence consistent with the applications regulations. *See* 20 C.F.R. § 404.1520c(c)(2) (governing consideration of medical source statements); SSR 16-3p, 2017 WL 5180304, at *1 (Oct. 25, 2017) (governing consideration of nonmedical sources).

The ALJ's assessment of Plaintiff's RFC was supported by the medical opinions of Plaintiff's neurosurgeon, Dr. Hopkins, who removed Plaintiff's work restrictions in June

2020, and further opined that Plaintiff had exertional limitations related to lifting over 25 pounds, bending, twisting, and squatting (Tr. 58-59).  The ALJ found Dr. Hopkins' opinion persuasive, and explained his finding as required by the relevant regulations. Specifically, the ALJ explained that Dr. Hopkins' opinion was supported by Dr. Hopkins' treatment records and prior examination notes and was consistent with the Plaintiff's examination findings (Tr. 58).  *See* 20 C.F.R. § 404.1520c (the ALJ is required to explain how he considered the factors of supportability and consistency of a physician's opinion, but is not required to explain how he considered the remaining factors).

The ALJ also found that Plaintiff's RFC was supported by the opinion of consultant Dr. Sorokin, who opined that Plaintiff had decreased range of motion in his lumbar spine (Tr. 57-58).  "[I]t is appropriate for the ALJ to rely upon the assessment of a state agency consultant."  *Laymon v. Colvin*, No. 14-CV-39-CJP, 2014 WL 5420270, at *6 (S.D. Ill. Oct. 24, 2014) (citing *Schmidt v. Barnhart*, 395 F.3d 737, 745 (7th Cir. 2005); *Cass v. Shalala*, 8 F.3d 552, 555 (7th Cir. 1993)); *see also* SSR 96-6p, 1996 WL 374180, at *2 (July 2, 1996) ("State agency medical and psychological consultants are highly qualified physicians and psychologists who are experts in the evaluation of the medical issues in disability claims under the Act.").  The ALJ accounted for these findings in Plaintiff's RFC by limiting the claimant to a reduced range of light exertional work with postural and manipulative limitations (Tr. 58).

Further, the ALJ properly rejected the opinion of Dr. Davis finding that Plaintiff would not be able to tolerate a full work schedule and would be off task most of the day, by articulating the reasons for finding the opinion unpersuasive (Tr. 59).  Specifically, the

ALJ found that Dr. Davis's opinion was not consistent with his own treatment notes or Plaintiff's examination findings. *See, e.g., Pavlicek v. Saul*, 994 F.3d 777, 783 (7th Cir. 2021) (Substantial evidence supported the discrediting of a medical opinion when there was a "stark contrast" between the provider's treatment notes and his opinion).

Finally, the ALJ properly evaluated the third-party function reports submitted by Plaintiff's mother, stepmother, and wife (Tr. 59). In doing so, the ALJ summarized the nonmedical opinions and considered them when crafting Plaintiff's RFC, while also correctly noting that he was not required to evaluate this evidence using the same evaluation factors he used for the medical opinions. *See* 20 C.F.R. § 404.1520c(d) (the ALJ is not "required to articulate how [he] considered evidence from nonmedical sources using the requirements of" Section 404.1520c(a)-(c)); *Mueller v. Comm'r of Soc. Sec.*, No. 20-CV-1244-RJD, 2022 WL 704336, at *3 (S.D. Ill. Mar. 9, 2022) (citing *Moore v. Colvin*, 743 F.3d 1118, 1123 (7th Cir. 2014)) (While the ALJ is required "grapple with evidence that may run counter to [his] conclusion", he is not required to evaluate or discuss every piece of evidence in the record).

In sum, after careful review of the record and the ALJ's decision, the Court finds no legal errors. Further, the medical evidence and the state agency consultants' opinions support the ALJ's RFC. Even if reasonable minds could differ as to whether Plaintiff was disabled at the relevant time, the ALJ's decision must be affirmed if it is supported by substantial evidence, and the Court cannot substitute its judgment for that of the ALJ in reviewing for substantial evidence. *Burmester*, 920 F.3d at 510; *Shideler v. Astrue*, 688 F.3d 306, 310 (7th Cir. 2012). Because the ALJ followed the steps required by the regulations

and supported his findings by pointing to substantial evidence in the record, the Court will not overturn the ALJ's decision on this basis.

## Conclusion

After careful review of the record as a whole, the Court is convinced that the ALJ committed no errors of law, and his findings are supported by substantial evidence. Accordingly, the final decision of the Commissioner of Social Security denying Plaintiff's application for disability benefits is **AFFIRMED**. The Clerk of Court is directed to enter judgment in favor of Defendant.

    **SO ORDERED.**

    Dated: March 21, 2023

                                                                 _____

                                                               DAVID W. DUGAN
                                                               United States District Judge

27